Sky Boles
3307 W Echo Ln
PhoenixAZ 85051
(602) 638-8350

FILED ___ LODGED
___ RECEIVED ___ COPY

AUG 2 7 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sky Boles , <br><br>          Plaintiff, <br><br> v. <br><br> The Phoenix Police Department; <br> The Phoenix Police Department Cactus Park Precinct; <br> The County of Maricopa; <br> The Maricopa County Attorney's Office; <br> Officer Mike Tennyson Badge # 07151; <br> Officer Keneth Perry Badge # 05550; <br> Officer Toby Sexton Badge # 05526; <br> Sergent Bentivegna Badge # 5626; <br> Officer Kevin Sargent; <br> The City of Phoenix; <br> THE MARICOPA COUNTY SHERIFF; <br> MARICOPA COUNTY DEPUTY ATTORNEY <br> ESDRAS M RIVERA ID 032160; <br> MARICOPA COUNTY DEPUTY ATTORNEY JON <br> WENDELL ID # 102603; <br> MARICOPA COUNTY OFFICE OF THE LEGAL <br> DEFENDER; <br> MARICOPA COUNTY CONTRACT ATTORNEY <br> SHERRI LAURITANO; <br> PHOENIX POLICE DEPARTMENT <br> PROFESSIONAL STANDARDS BUREAU; <br> Sergeant Howard M Stevenson Badge # 06468; <br> Sergeant Patrick Trejo Badge # 07085; <br> Lieutenant David Moore of the Professional Standards <br> Bureau; <br> Officer Michael Walker Badge # 09051, <br>          Defendant(s). | CASE NUMBER:    CV-18-2712-PHX-SPL-ESW <br><br><br><br><br><br> **COMPLAINT** |

## Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 - Federal Question §§ 42 USC 1983. The plaintiff is a resident of Phoenix, Maricopa County, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a

resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of PHOENIX, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The defendant, , is a resident of Phoenix, AZ and a citizen of the United States. The cause of action arose in the Phoenix division.

## Complaint

Timeline of Events related to Claim:

On August 27, 2018, Sky Erraen Boles, ("Sky"), called 911 approximately five (5) from approximately 4 p.m., until approximately 10 p.m., at which time the Phoenix Police Department falsely arrested me Without Probable Cause, and charged with the following crimes:

3 Counts of Felony Aggravated Assault with a Deadly Weapon

2 Counts of Disorderly Conduct

On August 27, 2018, from approximately 3:53 p.m. and 11 p.m. at my home, which I am the owner of, located at: at approximately 3:53 pm, 3307 W Echo Ln., Phoenix, AZ 85051:

I, Sky Boles, placed a call to 911 to request a Police Standby to remove two trespassers, Justin Seiter, ("Seiter") and Jenna Makela, ("Makela"), (the "Trespassers"), from my home, which I owned and resided in. The Trespassers had paid for a week at my home and then gone broke and refused to leave. Seiter asked to stay an extra week and asked if Seiter could provide carpentry work in exchange for the room, to which I stated that I would consider the matter if Seiter would meet me at 10:30 am on Saturday, August 27, 2018

to discuss the matter.

A day prior to this meeting, Seiter began displaying erratic and problematic behavior. He attempted to remove the cast iron tub from my back yard and sell it without my permission, and when I asked him why, he said, "to help you, I want to show that I am useful so I can stay". I then told him not to touch anything in the house and not to do anything at all to the house or with any of the property in the house, without my permission and unless I was present. Later that night, Seiter tried to remove the tools from the downstairs closet, when I stopped him, he again claimed that he was trying to "help". At the time both Seiter and Makela were displaying behavior consistant with drug use and "being high", including, but not limited to: "twitching", accelerated speech, aggressive behavior, illogical responses, inability to focus, extreme forgetfullness requiring the constant need to repeat instructions, unwillingness to follow instructions, and inability to understand or respect boundaries. They further, both stated that they didn't have to drug test anymore as of August 26, 2018 and were celebrating.

On or near August 27, 2018, at 10:30 am in the morning, Sieter was missing and did not appear for the agreed upon meeting, although I had already determined to not allow Seiter to stay in exchange for carpentry work, I affirmed that his inability to show up for the meetings was reasonable grounds to quit him from the residence, however, since he was not at the residence I resolved to tell him later that day.

At approximately 2 pm on August 27, 2018, I left my home on errands and when I returned at approximately 3:45 pm, Seiter had returned to my home and, had taken the tools from the downstairs closet and removed a door frame on an upstairs bedroom door. I proceeded to tell Seiter and Makela that they needed to leave immediately, and that Seiter would not be doing "carpentry work" in exchange for an additional week stay. Seiter and Makela refused to leave, and I called 911 to request a police standby to have them removed.

3:53 p.m. Incident Report# 201600001593556

I called 911 at approximately 3:53 pm in the afternoon on August 27, 2018. Seiter became angry that I was calling the police and immediately attacked me. I was standing next to the window in the upstairs bedroom that Seiter had removed the door-frame from. When Seiter attacked me, he broke the glass in the window and the glass caused long and deep cut, approximately 3" across and deep enough to cause a large amount of blood loss, causing me to become disoriented.

I reported this to the 911 operator who began to question me about Seiter, who was trying to flee the premises until Officers Toby Sexton, ("Officer Sexton"), and Kenneth Perry, ("Officer Perry"), (the "Officers"), arrived on scene at approximately 4:05 p.m.

When the Officers arrived, they did Not check anyone's ID's, nor perform any background checks, nor investigate in any way. This is especially relevant because Seiter has multiple priors and had recently gotten out of jail for assault and endangerment and both Seiter and Makela had to drug test for the state.

Instead of checking IDs, the Officers questioned me, while my wrist was still bleeding profusely, and with the Trespassers standing in the same room, participating in the conversation. One of the Officers stated that he had gotten calls from me before.

I stated that Seiter and Makela were trespassing and had not paid rent. Seiter claimed, in response that he had paid $330.00 for two weeks "rent", and alternately stated that he was doing "carpentry work" in exchange for a room. He and Makela had no receipt of payment, nor lease. I quoted A.R.S. 33-1378 to Officer Sexton.

Officer Sexton verbally argued with me stating that they Were Tenants, and that they were allowed to stay in the residence for another week, that they did not need to prove in any way that they had paid to stay there, and instead, that I needed to prove that they Had Not paid.

He further stated that he did not believe I was the homeowner and asked what I did for a living. When I said that I was a full time College student Officer Sexton said, "that's not a real job!" They then questioned me about the ad I had placed and if it said that I was, "420 friendly". The only ad I had placed for rooms in my house said only that I am a Pagan, and I believe Officer Sexton was discriminating against me because of my religion, which was publicly listed in the ad, and implying because I'm a pagan I must also be a drug addict, which I am not, and at the time I did not know what "420 friendly" meant, although I have since learned its meaning.

The Officers stated that they would only remove Seiter and Makela if I paid Seiter and Makela to leave, and then attempted to negotiate with myself and Seiter and Makela about how much I would pay them to leave. During this portion of the conversation, Seiter and Makela made different statements about how much they had paid to stay there, first asking for $330, then asking for $175, then asking for $150. During this conversation Officer Sexton stated, "she's got blood all over her wrist, you've got blood on your face,

take the $150.00, get your stuff".

I proceeded to the bank in an attempt to withdraw the money and the Officers stayed at my house while I was gone with Seiter and Makela, they were there when I returned, and when I didn't have the money (because my student loan check had not been deposited into my bank account). When the Officers learned that I didn't have the money, they prepared to leave and repeated that I had to allow Seiter and Makela to stay in my home for an additional week or I would be arrested.

and further, Told the Trespassers, that they could stay in the upstairs bedroom where Seiter had broken the window, for an additional week, and that if I called the police again or tried to remove them in any way, to call him. He also informed me with them watching that if I tried to remove them from my home or called the Police again that I would be arrested for filing false police reports and that he would take my pets to the humane society. This is especially notable as a threat because I run a No Kill shelter for pets with medical or behavioral problems that have been rejected by the Humane Society who has stated they would have No Choice but to put them down on multiple occasions prior to August 27, 2018.

When I stated that Seiter had removed an upstairs door-frame, Seiter admitted it, and it was also apparent from looking. In response, the Officers stated that Seiter removing my door-frame neither counted as a crime, nor as grounds to remove Seiter because Seiter had removed the door-frame with "good intentions". The door-frame was made of solid wood and had cost approximately $300 to install.

When I asked the Officers to accompany me upstairs they refused. When I stated that I had proof that Seiter broke the window, they refused to examine it. When I asked the Officers about the cut on my wrist Officer Sexton said, "You broke your own window and cut your own wrist because you are crazy!".

The Officers cancelled the Firetruck that 911 had dispatched to aide me, and wrote the following in corresponding Police Incident Report # 201600001593556:

SKY BOLES RENTED A ROOM TO JUSTIN AND JENNA THE OTHER WEEK AND THEY PAID HER RENT, SHE ALSO MADE AN AGREEMENT TO LET JUSTIN DO CARPENTRY WORK AROUND THE HOUSE FOR RENT SO HE AND JENNA ARGUED IN A UPSAIRS BEDROOM, DURING THIS ARGUMENT JUSTIN SAID THAT SKY BROKE A BEDROOM WINDOW ACCIDENTALLY WHEN SHE TRIED OPENING THE WINDOW. SHE ALSO HIT THE WINDOW WITH A BACKPACK WHICH BROKE THE WINDOW MORE. SHE CALLED THE POLICE AND

TRIED STATING JUSTING BROKE THE WINDOW IN AN ATTEMPT NOT TO FULFILL THE RENTAL AGREEMENT.

A ROOMMATE AND ANDREW WHO WAS PRESENT VERIIED SKY AGREED TO THE CARPENTRY WORK BY JUSTIN AND STATED THERE WAS AN ARGUMENT BETWEEN THE TWO BUT HE DID NOT SEE WHO BROKE THE WINDOW. THIS IS A BAD LIVING SITUATION AND SKY IS 918. THERE WAS NO RESOLUTION, NO CRIME.

There is no record that I was injured in the report at all.

Before the Officers left I asked them to at least accompany me to the upstairs bedroom so I could gather my items, such as tools, that Seiter had taken. The Officers refused and left me alone and injured with my attackers. At this point I was very week and disoriented from blood loss, and upset from the circumstances hereinabove described. The Officers had remained at my residence for approximately an hour before they left.

After they left, I attempted to remove my tools and other items, which Seiter had taken without my permission, including but not limited to: my toolbelt, my toolbox, my power tools, my manual tools; from the room the Officers had given to Seiter and Makela. Seiter proceeded to attack me multiple times and I took a recording of the conversation. Seiter admitted on record to taking my tools and removing my door-frame. After Seiter had attacked me multiple times I called 911 again at approximately 5:17 p.m.

My mother's friend Eugene Macleroy, ("Macleroy"), also arrived to help near this time.

5:23 p.m. Incident Number 16001594077

Officers Sexton and Perry proceeded to intercept my calls to 911, state that I was 918 delusional, and clear or cancel those calls.

5:26 p.m. Incident Number 16001594097

The Trespassers in turn called Officers Sexton and Perry as instructed. Officers Mike Tennyson and Michael Walker responded to these calls. When the Officers were there, my mother's friend Eugene

Macleroy, who was present during the Trespassers' battery of me tried to inform the Officers that Seiter and Makela had attacked me, shoving a mattress box spring into me and shoving me into a closet. While Macleroy Told Officers Tennyson and Walker what occurred, they only stated that everyone was telling different stories, and left again.

7:52 p.m. Incident Report # 1600159889

MENTALLY ILL SUBJECT – NO ACTION ERQUIRED (in response to my call)

7:59 p.m. Incident Report # 16001594941

My roommate Anthony Genis, ("Genis") came to the residence to move his belongings out, as he had stated he was moving out earlier that day. He and I had faught because he was in a romantic relationship with Makela and further had refused to tell the police that Seiter had smashed the upstairs window even though he had seen Seiter smash the window. He had further, informed the police that he had not seen who had smashed the window in a phone call. After Genis arrived, to remove his belongings from the residence, I asked to look through the room to make sure nothing of mine was in there and he agreed, then, when I attempted to look into the dresser in the room, which I owned, as the room had been a furnished guest room, Genis had attempted to stop me from looking in the dresser, and then had kicked me to get me away from the dresser. At that point Seiter entered the room through the open doorway and I again called 911. Seiter and Genis blocked the exit to the room, standing very close to me when I sat down against the opposite wall.

My friend Shawn Head had come to my home and I yelled for him to come upstairs. I called 911 again, but it was cleared again as a 918.

Seiter told Genis to call the Police too and Genis did call the Police. He reported that I "bit him on the lip", which I did not due. The story was later changed to, I "head butted" Genis. I sat down against the wall because both men were blocking the exit to the room. The men approached me and put their faces in my face while talking to 911 and they also shouted at me.

When Officers arrived, they questioned Head as to whether I used drugs, and then told him to leave. They threatened to arrest everyone if they were called again and then left me alone with my three attackers.

8:48 p.m. Incident Report # 16001595241

DOMESTIC VIOLENCE - CANCELLED

Seiter, Makela, and Genis follow me around the house and then Seiter breaks all the dishes on the kitchen counter and puts his foot through the pantry shelf.

I place a call to 911 requesting help and the call is cancelled by the Cactus Park Precinct.

8:53 p.m. Incoming call from the Cactus Park Precinct

I receive an incoming call from Sharon, no last name given, from the Cactus Park Precinct. She states that the Seargent told Sharon to call me and inform me that the Police would not come back out to my residence that night for any reason, and that if I called the Police again I would be arrested for filing a false police report. When I asked Sharon who the Seargent was she hung up on me.

10 p.m. Arrest Report # 16001595326

Officer Christopher Tiona and his Partner arrive, standing approximately twenty feet in front of my front door, on the lawn, and allowing Seiter, Makela, and Genis to approach them and taking their statements, but refusing to allow me to approach them or take my statement. Officer Tiona shouts at me across the lawn that they are Not responding to a call for help, but instead performing a "safety check" due to the activity at the house during the day. I explain that Seiter broke my pantry shelf and has been attacking me all day and ask the Officer to look at the broken shelf, which he refuses to do.

Officer Tiona then states that the Police will not return to my home tonight and that if I call them again I will be arrested. He then tells me to go inside, which I do, and I closed my front door behind myself. Seiter and Makela were still outside, and I was inside with Genis and my neighbor Ronald Gerber who had responded to my call for help.

Officer Tiona then proceeds inside my home, through my closed front door, without my permission, and arrests me while I am standing at my kitchen table with no further explanation.

The corresponding Arrest Report claims that I, "swung a hammer", "picked up a mattress and pinned

Makela to the wall cutting off her breathing for approximately 10 seconds", "kicked open the bedroom door", (which I have a key to), and "broke her pantry shelf". All of these statements were either made up, or hearsay, as none of them had occurred and, as Ronald Gerber can testify, nothing was occurring at all when Officer Tiona and company arrived and for the duration of their time at my residence.

4rth Avenue Jail

He and his partner drag me to their Police Vehicle and I was searched and transported by Tiona and his partner to the 4rth Avenue Jail. I am still injured, and my cut has not been treated all day. I began vomiting in the back of the police vehicle and shaking presumably from the blood loss from my wrist, which had been bleeding for approximately six hours by the time I was transported. The Officer at the 4th Avenue Jail only asked if I was on drugs.

August 28, 2016

I was then made to sit on a stone bench until approximately 3 a.m. in the morning with my wounds untreated. At this point I had several bruises, the cut, and severe head paid, and blood loss.

I was examined by medical staff; however, they did not treat my wounds and would not record them except to note briefly that I had them and where they were. My mugshot was taken and uploaded to a public website, casting me in a false light as a felon and defaming me. When I asked what I had been charged with, I was told, "Aggravated Assault with a Deadly Weapon", and when I asked what the weapon was supposed to have been I was told, "a hammer".

I was moved from the stone bench in the waiting room to a stone cell with a stone bench and a public toilet where I was forced to defecate in a public setting. There was no air conditioning and I was not fed until approximately 2 p.m. the next day. I was kept in the stone cell until I saw a Judge at approximately 8 am Sunday morning August 28, 2018.

August 28 – September 09, 2016 – Maricopa County Sheriff's Department

I stated to the Judge that I was the victim of the crime and the Judge stated that the Officers had said they had probable cause to arrest me and set my bail at $5000.00, which I could not pay. I was charged three counts of aggravated assault with a deadly weapon and then two counts of criminal damage, for allegedly

damaging my own property. I was taken back to the stone cell until I was transported to the Lower Buckey Jail.

I was transported to the Lower Buckey Jail where I was kept in another stone cell and again forced to defecate in public. I was strip searched and forced to squat and cough. I was made to wear clothing that said, "unsentenced" as if I was already considered guilty of the crime and was only awaiting punishment.

All of my phone calls were recorded, and further I could only make collect calls and only to numbers that had pre-paid for the ability to receive collect calls from the jail. While I was in jail no one was taking care of my six pets and I suffered severe emotional distress thinking they had been injured by the Trespassers who were allowed to reside in my resident rent free by the Phoenix Police Department. I believe that recording an innocent person's phone calls is a violation of their Constitutional Rights.

In the jail it was so cold that female inmates had to steal blankets to survive without getting sick. The jail had/has a written policy that forbids inmates from having an extra blanket, and the blankets are threadbare and very thin, the temperatures are kept at approximately 60 degrees during the day, and lowered at night. My injury was never treated during my stay at the Lower Buckey Jail, nor was it properly recorded by the staff there, who stated they could only treat injuries inmates had received in jail.

Also, meals were only served twice a day and with an inadequate amount of food. Breakfast was two loaves of bread, a baggie with peanut butter, one serving of jelly, an orange and two small cookies. Dinner was a tray with approximately five 1 serving items, many of which had strange chemicals in them, or blackened food, (black carrots most especially), making the food difficult if not impossible to eat. The potatoes had some sort of creamy substance that inmates had to rinse out before they could eat. The cantina is owned by Sheriff Joe Arpaio's wife as well, which means he personally profited from providing inmates with as little and as unpalatable food as possible for the purposes of increasing sales through the jail cantina.

I lost approximately fourteen pounds in my two weeks stay at the jail. Further, my injury on my wrist became severely infected, turning red, and traveling halfway down my arm, causing me fever and chills. A female inmate had to borrow medication for me from another inmate so that I did not suffer extremely severe circumstances due to the untreated wound.

Finally, women in the jail, pregnant mothers, were forced to give birth and then give up their children

approximately two hours after birth, which is detrimental to the health and well-being of the child, and inflicted a large amount of emotional stress upon myself.

## Maricopa County Defender/Office of the Legal Defense

When I was transported to my second preliminary hearing, it was actually an event where my defense attorney attempted to offer me a plea bargain. He did not ask for the circumstances of my case, nor any details beyond identifying information. However, to his great credit, after I explained to him the situation he had an investigator from his department photograph my bruises, and further requested the 911 calls I had made, which had not been submitted as evidence nor noted as supplemental information to that date. He further, motioned for me to be released on pre-trial supervision without bail. I am led to understand that he went above and beyond and that most Maricopa Defense Attorney's caseloads are so high/large, that they rarely have time to investigate on this level. Attorney Van Dorn worked for the Maricopa County Defender's Office.

Because Seiter had been previously convicted of a felony in Arizona my case was transferred away from Attorney Van Dorn to the Office of the Legal Defender and Attorney Sheri Lauritano was appointed to my case.

When the Court signed the release order I was not permitted to return to my home, which I am the owner of, because the Trespassers had been listed as both residence of my home, and as victims, even though they did not have leases and had paid no rent of any kind. I was held for approximately 29 hours after the Judge signed my release order, by the Maricopa County Sheriff's Department.

I was transported in chains during my release, and when I questioned this, Officer Forrester of the Maricopa County Sheriff's Department threatened me, saying I wouldn't be released if I kept asking questions, and leaving me behind when he took the other inmates who were scheduled for release. This was only a malicious action designed to cause emotional distress on his part, because after some hours, he returned and picked me up and transported me to the location of release.

## CHARGES

I was initially charged with:

3 Felony Aggravated Assault with a Deadly Weapon,

2 Counts of Defacing Property

The Detective assigned to the case was Detective Chavez, whom I tried to contact to explain what had occurred. Det. Chavez only told me that she could not speak to me. The Officer's claimed to have probable cause in the probable cause report, Officer Tiona states that I "swung a hammer" and "broke a shelf" as if he had witnessed these events, when in reality, he had only taken down statements of hearsay, and those statements directly contradict statements made in police reports from earlier that day. I was imprisoned in the Maricopa County Jail system for approximately two weeks.

September 11, 2016 – Date of Release from Jail to Partial Imprisonment

I was held at the location of release in another stone cell and again was not fed until approximately 1 pm. The Officers at this location took my DNA and I want that information expunged. The took a sample of my saliva, took my fingerprints, and any other items they took.

I was fitted for an ankle monitor and told I could not return to my home, and that I needed to find a place to stay by nightfall or I would have to go back to jail. I was not permitted to drink alcohol, nor own firearms, nor leave my home between 10 p.m and 6 a.m. I later learned that my pre-trial services Officer also made a list and a recording of every single place that I travelled to. I was also told that Officers could listen to what I was saying through the ankle monitor.

I was released at approximately 2 pm, and made to walk approximately a mile in the sun to the bus stop. While I own a car, I did not have access to it from the jail.

St. Joseph's Medical Center

I immediately proceeded to St. Joseph's Medical Center where I was examined by Dr. Sheperd of the ER. He stated that I had glass embedded in my finger, an old cut on my right wrist, bruises on my arms and legs, and heavy bruises on my inner thighs consistent with sexual assault.

After leaving St. Joseph's, I travelled to the CVS Pharmacy at Washington and 1rst Avenue in Phoenix, and contacted the Phoenix Police Department to have them document my bruises. Officer Liu of the

Phoenix Police Department arrived and I asked him to take an assault report. He refused to photograph my bruises, instead asking about the ankle monitor on my leg, and refused to take an assault report. He then told the store clerk of CVS that I was a dangerous and unstable person and I was asked to leave although I had already made a purchase.

September 11-November 15, 2016

I was forced to live on my friend's living room floor from September 12 until November 15, 2016, before being permitted to return to my home by the City of Phoenix and Maricopa County. During this time, I was forced to pay the bills while the people who assaulted me and damaged my property lived in my home for free.

My probable cause hearing was vacated and my charges were altered to the following:

3 Counts of Felony Disorderly Conduct,

2 Counts of Level 1 Misdemeanor Assault

Count of Level 1 Misdemeanor Assault

I messaged my Defense Attorney Sheri Lauritano, and called her on multiple occasions asking her to motion to modify my release conditions as soon as possible because of the pets in my home. She ignored all of my requests letting the time run out until my initial pre-trial hearing and then only requested that I be allowed to return home, not to have the ankle monitor removed. I also sent Attorney Lauritano a copy of the recordings I had taken on August 27, 2016.

The recordings included recorded statements including, but not limited to, the following:

Officer Toby Sexton, "she's got blood all over her wrist, you've got blood on your face, grab your stuff"

Justin Seiter, "she never laid a hand on me"

Attorney Lauritano never included these recordings in the Discovery for my case, when I questioned her, she said they made my case worse, and made me look "disorderly". I was permitted to look at the

Discovery and learned that the "hammer" I was supposed to have threatened people with was my doorstop hammer, or, the hammer that I used as a doorstop in my home. It was confiscated by the Phoenix Police Department and has not been returned.

Loss of Consortium as Placement for Biological Nieces and Nephews

I had previously applied to be a Foster Parent through Agape Adoption Agency because the DCS had turned down my Kinship Care Application because of my "income". My Level 1 Clearance Card was revoked by the State of Arizona because I had been charged with a violent crime although not convicted, this flies in the face of "innocent until proven guilty". In turn, because my Level 1 Clearance was revoked I could no longer pass the background check and my Foster Care Application was revoked, and I was prohibited from being Foster Parent/Temporary Guardian/Kinship Care Placement for my sister's children, who were made Wards of the State on or near November 15, 2015.

The children were separated, kept in separate group homes, have suffered psychological trauma, physical injuries, and forced participation in religions other than their own, kept in abusive foster care situations, and exposed to abuse, assault, battery, and general violence, and forcefully medicated and imprisoned themselves when they attempted to break free or defend themselves in any manor; during this time that I have been unable to take them into my three bedroom home, which I own, and is five miles away from their parents, nor was I permitted to see them, although I have raised them all their lives; because of the charges filed against me, with no proof of any kind, and in the face of the evidence I provided demonstrating that I was, in fact, victimized.

Defamation and False Light, Gaslighting – Portrayal as an Insane Criminal instead of Victim

Store attendants began to follow me around stores whenever my ankle monitor was visible, and I was turned down for over 40 jobs.

I requested a copy of the police reports from 1717 E Grant Street, Public Records, and learned that Officer Toby Sexton had falsified Incident Report # 201600001593556, casting the false light that I was both uninjured, that I was crazy and, or delusional, that I was violent, and further, that the Trespassers in my home were Tenants, which they Were Not.

October 26, 2016

I filed a Complaint at the City of Phoenix online Complaint Form located at website: https://www.phoenix.gov/police/commendation-complaint-form, on multiple occasions. I further filed a complaint with the (main office) of the Phoenix Police Department. All of my complaints were brushed off with No Further investigation than to determine that I had been charged with a crime, and that the Police thought I was 918.

I learned that the Police Reports included herein and related to and, or associated with my arrest on August 27, 2016 were Not compiled not added together as supplemental reports, etc. Further, that NO additional reports, which are included herein, were given to the Prosecutor in my case, except for the Arrest Report. I attempted on multiple occasions to correct this, and Attorney Lauritano began to behave in an adversarial manor towards me after I suggested she combine the Police Incident Reports from the same day to the Arrest Report.

September 2016 to April 16, 2018 – Loss of income from Defamation

I had lost my job and lost a business contract while in Jail, and further, could not get a job because of the ankle monitor I was forced to wear. At one interview, I walked in and was immediately refused before being interviewed.

I had been warned by the police to not "rent" to any more people on Craigslist, and therefore fell into indigency.

November 15, 2016 Incident Report # 201600002122444

I wasn't permitted to return to my home until November 15, 2016, although I was required to pay all the bills for the residence while being prohibited from residing there.

Two weeks before I was permitted to return to my residence, my cat Bob was killed, presumably by the Trespassers who had been permitted to reside there. Bob was the most important thing in my entire life. When my child died, I had wanted to kill myself until I met Bob, who had been a replacement for my dead child.

Upon returning to my residence, I immediately discovered that everything I own had been stolen,

including, but not limited to: the washer and dryer, a claw foot tub from, all of my computers, laptops, camera equipment, a documentary from Kenya chronicling the sex workers who cured AIDS, all of my tools, my jewelry, my art supplies. The Trespassers Seiter and Makela are listed as the chief suspects for the theft. Further, my home had been damaged, including but not limited to: missing trim around the entire house, a missing door and frame on the upstairs bedroom, another damaged frame on the second upstairs bedroom, the door to the master bedroom kicked in, damaging the frame; multiple holes in the drywall, spray-paint on the doors which are solid, unpainted wood, damage to the marble counter in the bathroom, a broken upstairs window. I filed a theft and vandalism report with the Phoenix Police Department.

December 16, 2016 Incident Report # 201600002310996 and IR& 2016-168023

On or near December 16, 2016, I contacted the Cactus Park precinct stating that I had Police Report # 201600001593556, which did Not state that I had received Incident Report # 201600001593556, which was the report from when I initially called 911 at approximately 3:53 p.m. on August 27, 2016.

I stated that Report 1 did not state that I was injured and I had proof that I was injured, including a recording where the Officers on scene verbally confirms, "she has blood all over her wrist",

(Stuff), and that I wanted the Police to update Report 1. Seargent Bentivegna, from the Cactus Park Precinct came to my home with another Officer and said he thought I was mentally ill, and could he call a mental health unit to my home. I stated that I had evidence that I was injured at the time of my arrest and that it was relevant, and the Seargeant asked what I wanted and I said I wanted to file a Police Report. Officer Keven Sargent then took the report.

Officer Sargent stated that a recording was taken in Incident Report # 20160002310996, previously recorded on 9/10/16 (a call I made from jail)

The case was transferred to Det. Kimberly Wyatt, ("Det. Wyatt"). Wyatt writes in the supplemental report, that I had already reported the assault and she referred to Incident Report # IR& 2016-168023, claimed I had problems with "roommates". She further states that Detective Bach investigated the case and stated the following:

Det. Bach stated I had already placed 41 calls to phoenix police by Sept. 10, which is an approximation, but essentially is representative of the high crime in my neighborhood. Reasons I called the police are: car

including, but not limited to: the washer and dryer, a claw foot tub from, all of my computers, laptops, camera equipment, a documentary from Kenya chronicling the sex workers who cured AIDS, all of my tools, my jewelry, my art supplies. The Trespassers Seiter and Makela are listed as the chief suspects for the theft. Further, my home had been damaged, including but not limited to: missing trim around the entire house, a missing door and frame on the upstairs bedroom, another damaged frame on the second upstairs bedroom, the door to the master bedroom kicked in, damaging the frame; multiple holes in the drywall, spray-paint on the doors which are solid, unpainted wood, damage to the marble counter in the bathroom, a broken upstairs window. I filed a theft and vandalism report with the Phoenix Police Department.

December 16, 2016 Incident Report # 201600002310996 and IR& 2016-168023

On or near December 16, 2016, I contacted the Cactus Park precinct stating that I had Police Report # 201600001593556, which did Not state that I had received Incident Report # 201600001593556, which was the report from when I initially called 911 at approximately 3:53 p.m. on August 27, 2016.

I stated that Report 1 did not state that I was injured and I had proof that I was injured, including a recording where the Officers on scene verbally confirms, "she has blood all over her wrist",

(Stuff), and that I wanted the Police to update Report 1. Seargent Bentivegna, from the Cactus Park Precinct came to my home with another Officer and said he thought I was mentally ill, and could he call a mental health unit to my home. I stated that I had evidence that I was injured at the time of my arrest and that it was relevant, and the Seargeant asked what I wanted and I said I wanted to file a Police Report. Officer Keven Sargent then took the report.

Officer Sargent stated that a recording was taken in Incident Report # 20160002310996, previously recorded on 9/10/16 (a call I made from jail)

The case was transferred to Det. Kimberly Wyatt, ("Det. Wyatt"). Wyatt writes in the supplemental report, that I had already reported the assault and she referred to Incident Report # IR& 2016-168023, claimed I had problems with "roommates". She further states that Detective Bach investigated the case and stated the following:

Det. Bach stated I had already placed 41 calls to phoenix police by Sept. 10, which is an approximation, but essentially is representative of the high crime in my neighborhood. Reasons I called the police are: car

stolen by a stalker who decided I owed him money, stole my laptop and other items I owned. The Police told me to call them every time there was an incident and then essentially said I couldn't prove it was him every time, called when he texted me, when he broke into my house, when he left stuff, etc. I also placed multiple calls for domestic violence and gunshots heard in my neighborhood, I was further assaulted on three occasions in 2016, and I reported multiple drunk drivers as well. I believed that calling the police was the easiest way to prevent crime in a neighborhood full of criminals.

Det. Bach's report goes on to state that I head butted Genis, and that Genis had a "split lip", which, is untrue. Further, it is apparent from the photos taken of Genis on August 27, 2018, that he did Not have a split lip.

The case was closed without further investigation.

December 28, 2016 Case # JC2016-145073

On or near December 28, 2016, I was falsely charged with another crime of trespassing at a Community College Campus without due process. I was not properly served and a warrant was issued for my arrest. Further, I was forced to drive to Mesa on multiple occasions to defend myself from this charge, and am still required to do so. It was brought to my attention that I had been charged with tis crime because I had correspondingly been charged with the crimes associated with the events hereinabove.

December 22, 2016

At a pre-trial conference without the court reporter taking notes, Prosecutor Esrada acknowledged that while police claimed I injured a girl by, "picking up a mattress and pinning her to the wall with it cutting off her breathing for 10 seconds", that there was not a bed in the room where this supposed event took place.

Prosecutor Estrada also stated that it was impossible to prove that I didn't do it, and further that they only needed a weapon, which was the hammer they had picked up off my foye', and any person to say that I had swung it at them.

January 03, 2017 – Lauritano Ignores Evidence and Motions for Rule 11

Attorney Lauritano and I had many disagreements, stemming, initially, from her refusal to enter my recordings as evidence, and further refusal to allow Ronald Gerber, ("Gerber"), to testify as a witness on my behalf. She stated that his testimony wasn't relevant because he arrived after the incident in question occurred. I disagreed with her because the actions and events described Never Occurred, and Gerber was able to testify that I was both injured at the time of arrest, and had called him for help, further, that no events of note occurred at all in relation to my arrest, accept that it was a "false arrest".

She and I argued about the use of the recorded statements I had at the time of my attack, she said they made me sound, "disorderly", and when I said stated that they recordings showed clear proof of my innocence she refused to respond. She stated that I would be going to trial with No Witnesses, and No Evidence of Any Kind, and that it was "your word against theirs".

Even after Seiter's criminal history was revealed and looking at all of the evidence Attorney Lauritano continuously delayed trial so she could attempt, repeatedly to force and, or cajole me into signing a plea bargain, which I had stated I would not sign.

She and I secondarily disagreed on the status of the Trespassers. I stated to her that Seiter and Makela were Trespassing in my home and disagreed. She disagreed with me about the meaning of the law A.R.S. 33-1378, which states that without a lease a guest is Not a Tenant. She seemed to feel that I was automatically guilty simply because I had been charged. She ignored multiples of my emails and phone calls.

I stated that I had never swung a hammer at the Trespassers as I am a pacifist, and further, was certain that Sieter, who was already battering me, would injure me further if I provoked him in any way, and further, that I had called the Police multiple times in response to Seiter's attacks as my primary and only response to him, as that is the legally appropriate and further, safest response when in danger from a violent party.

She then requested a Rule 11 hearing for me claiming that I could barely comprehend the events transpiring.

She attempted to use my ability to be a Kinship Care provider for my sister's children, saying it was in their best interest and I should think of them.

January 24, 2017 PSB Report# IA No: INQ17-0127

events herein contained stemming from the Malicious Prosecution against me, and I almost lost my home multiple times between May and November of 2017.

## May 2017 Refused Permission to visit Dying Uncle and Attend Grandmother's Funeral

My Uncle Daniel was hospitalized in June for cancer and I again was forced to request permission to leave the state, but this time it was denied because Attorney Estrada objected to my leaving. His reason was that I had missed a hearing for another case # JC2016-145073, scheduled on June 14, 2017. The reason I had missed that hearing is because it was scheduled on the same day as my pre-trial hearing for case # CR2016-140935-001, and Attorney's Estrada and Lauritano had late causing me to miss my hearing for case # JC2016-145073. I had further called the other Court as soon as possible to explain what had happened and the hearing was rescheduled. Thereby, Prosecutor Estrada used his own lateness to prohibit me from visiting my uncle before he died. I never got to see him, and he was my favorite uncle. Not seeing him, is something I can never get back.

I request a new Attorney based on irreconcilable differences between myself and Attorney Lauritano. Judge Theresa Sanders denies my request, but grants Attorney Lauritano's request to be recused. Attorney Lauritano claims that she has reason to believe I am going to lie on the stand, which is not true, and further, I had filed a complaint concerning her with the State Bar because she was ignoring evidence in my case.

## November 2017 – Seiter Arrest

Seiter was arrested stealing. The State issues a warrant for the alleged victims as they have all failed to appear and failed to contact Attorney Estrada and, or respond to his attempts at contact for over a year. Seiter is issued an Attorney by the Court in my case because he has been charged with a crime in a separate case.

## December 2017

My Grandma Ruth was dying in GA and I had to leave the State Without permission because I could no longer trust my Defense Council to file motions in a timely manner, and further, having been denied to travel to my Grandmother's funeral and to visit my Uncle Daniel before he died, I did not trust that the State would permit me to leave. I had to go through a special check at the Airport and I was permitted to

leave because, as I said, I was never confined to the state, so it is unreasonable that I ever had to seek permission to leave in the first place. I still suffered great anxiety and humiliation traveling to a foreign state under these circumstances and wearing an ankle monitor, not to mention having to explain to my Grandmother's relatives and friends why I was wearing it.

January 2018

Attorney Lockhart, sends a separate attorney in his place and that attorney says I have no choice but to extend the time for my case or Mr. Lockhart will proceed to trial without having interviewed any witnesses. Even though I allow an extension Mr. Lockhart refuses to interview witnesses, nor to submit evidence in my case.

April 2018

On or near April 01, 2018, Mr. Lockhart confirms that none of the alleged victims can be reached, but still attempts to cajole me into signing a plea bargain, stating it's in my best interest.

I threaten to sue him if he doesn't include my evidence in the discovery.

He finally includes a single witness, Ronald Gerber, in my discovery, and the State Immediately drops the charges against me. However, I do not get my ankle monitor off for additional days after this.

Summation:

This claim is against: Officer Sexton, Officer Perry, Officer Tiona, Officer Liu, Officer Sargent, Officer Walker, Officer Tennyson, Det. Wyatt, Det. Bach, Sargeant Bentivegna, Sgt. Stevenson, Stg. Trejo, and Lt. David Moore for Maliciously Prosecuting myself, an innocent citizen and crime victim, Sky Boles, and further, making it impossible for me to seek justice against my attackers. The City of Phoenix is also the subject of this claim, and is vicariously liable for the actions of its employees, as well as directly responsible for its failure to properly screen, hire, train, and supervise its employees, and its failure to implement proper policies, procedures, and training in the areas of probable cause, use of force, and

accurate reporting of those who respond to 911 calls in the City of Phoenix.

This claim is against Deputy County Attorney's Esrada Riveras bar ID #: 032160, and Deputy County Attorney Jon Wendell bar ID: 102603, and Maricopa County Attorney William G. Montgomer, all three, who's abuse of process lead them to maliciously prosecute me. This claim is also brought against the Maricopa County Attorney's Office who is vicariously liable for the actions of its employees, as well as directly responsible for its failure to properly screen, hire, train, and supervise its employees, and its failure to implement proper policies, procedures, and training.

This claim is against the Officer Forester, for intentional infliction of emotional distress. The Maricopa County Sheriff's Department is vicariously liable for the actions of its employees, as well as directly liable for its failure to property screen, hire, train, and supervise its employees. This claim is also against the Maricopa County Sheriff's Department for violating civil and human rights, and failure to implement proper policies, procedures.

This claim is against Attorney Sheri Lauritano appointed by the Office of the Legal Defender of Maricopa County, for ignoring evidence, violation of civil rights, and failure to Defend, and the Office of the Legal Defender who is vicariously liable for the actions of its employees and agents as well as directly liable for its failure to properly screen, hire, train, and supervise its employees and agents. The Office of the Legal Defender had a duty to Defend me and breached that duty in addition to my Civil Rights.


## Demand
### COUNT 1
42 USC 1983 Violation: Malicious Prosecution

Criminal proceedings were commenced against me under color of state law
The criminal proceedings were terminated in my favor
The Defendants involved did not have probable cause and lacked probable cause
The Defendants showed actual malice and a disregard for state and federal laws
The Defendants unreasonably siezed myself and my property


### COUNT 2
42 USC 1983 Violation: False Imprisonment

The Defendants, under color of state law, intended to and did confine me against my will

I suffered as a result of the confinement and was injured

The Defendants were aware of themselves confining me, of my confinement, and did confine me with intent

I was aware and conscious of my confinement and did suffer resulting harm

The imprisonment is and was a violation of my US Consitution Fourth Amendment Right


## COUNT 3

42 USC 1983 Violation: Fourth Amendment


The Defendants under color of state law, unlawfully searched my home, and siezed myself and my property without propable cause.


## COUNT 4

42 USC 1983 Violation: Fourteenth Amendment


The Defendants, under color of state law, did deprive me of my constitutional rights without probable cause, did abridge the privigeses and immunities of myself, a citizen, and did deprive me of libery and property without due proces of law, and did deny me equal protection under the law.


## Prayer for Relief

WHEREFORE, Plaintiff demands and prays this Court enter judgment, in favor of myself, and in pursuit of justice, as follows:

1. Awarding me present, and future, injunctive relief from the Defendant's violations of law.

2. Awarding judgment in my favor against Defendant in an amount equal to the above-referenced losses, as is deemed just and equitable to the Court, given the facts contained herein; including general and exemplary damages as accorded by statute; also any fees associated with court costs, legal filings and copies, fees related to services or processing of legal documents, or witnesses, and interest, from the statutory rate from the date of this filing.

3. Awarding Plaintiff's their costs and attorneys' fees pursuant to A.R.S. ¶ 12-341&12-341.01

4. Awarding Plaintiff such further relief as this Court deems just and proper. **Damages: $1,000,000.00**

Damages: Loss of income, loss of time, loss of reputation, humiliation, severe emotional distress

manifesting itself in physical symptoms, theft of over $10,000.00 in material objects from home, damage of a minimum of $6000.00 to my home, death of my cat, loss of consortium of my sisters four youngest children, loss of consortium – refusal to allow me to travel to see dying relatives, loss of consortium – refusal to allow me to travel to dead relatives funerals, being cast into a false light, loss of social standing, loss of freedom, forbidden to return to my home for approximately three months, loss of a business contract, loss of use of residence and transportation, physical starvation and exposure to freezing cold, loss of health, loss of mental well-being, loss of enjoyment of life, loss of ability to prosecute attackers/loss of justice, psychological trauma.  I suffered mental and emotional stress and trauma that manifested in physical symptoms including but not limited to: headaches, severe weight loss, muscle spasms, sleeplessness, teeth grinding to the point of chipping two teeth, and extreme neck back and arm pain.  Loss of income, loss of opportunity, imprisonment, loss of choice, loss of reputation, suffering from chronic embitterment syndrome – the idea that the morals that one believed governed one's community do not exist, or no longer exist, leading to a feeling of chronic bitterness and the debilitating behavior of having to recount the events cuasing the embitterment repeatedly, on a daily basis, for months or even years at a time, at great length and in great detail to the detriment of daily routine, personal relationships, and overall quality of life.  Financial damages, loss of work.  The experience of having been shunned, which is greater than the suffering caused by humiliation, but rather a combination of humiliation and loss of consortium, because a person is cast out of their entire community and loses multiple personal relationships at the same time because they were caused a type of humiliation that is too great to recover from and, or too great to allow those of who have not suffered to humiliation to continue to association with the victim, lest the humiliation be cast upon themselves by association, this event in turn leads the victim to a realization of helplessness which has been compared by some to the experience of rape, and in turn, leads to depression, thoughts of suicide and, or thoughts of committing extreme violence towards others, resulting in further guilt and mental anguish to the point that a person becomes "dehumanized", or, reduced by others and in their own minds to an object instead of an individual human being: loss of individuality, loss of self worth. The Plaintiff wants a trial by jury.

Date: _August 27, 2018_

_____ _Sky Boles_
Signature of Pro Se Plaintiff
Sky  Boles
3307 W Echo Ln
Phoenix, AZ 85051
(602) 638-8350